**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION**

| | | |
|---|---|---|
| American Service Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 5:17-cv-01120-JMC |
| | ) | |
| v. | ) | |
| | ) | |
| OnTime Transport, LLC, Amy Harmon, | ) | **ORDER AND OPINION** |
| Paul Weatherford, Kelli Rucker, and Kevin | ) | |
| Smith, *individually and as Personal* | ) | |
| *Representative of the Estate of Barbara A.* | ) | |
| *Rutledge Smith*, and Matthew Blue, M.D. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff American Service Insurance Company ("ASIC") moves the court for summary judgment in this declaratory judgment action. (ECF No. 63.) ASIC argues that based on Defendant Kevin Smith's ("Smith") allegations in the underlying state court action, the Commercial Automobile Insurance Policy ("Auto Policy") and Commercial General Liability Policy ("CGL Policy") (collectively, "Policies"), that ASIC issued to Defendant OnTime Transport, LLC ("OnTime")[1] do not provide coverage for the death of Defendant Smith's mother, Barbara Ann Rutledge Smith ("R.S."). (ECF No. 63 at 1–5.) ASIC is now seeking a declaration from this court that ASIC is not required, under either policy, to defend or indemnify OnTime for two state-court lawsuits that were brought against it and its employees.

The court **GRANTS IN PART** and **DENIES IN PART** ASIC's Motion for Summary Judgment (ECF No. 63). The court also **DISMISSES** OnTime's first through eleventh counterclaims (ECF No. 49 at 1–14 ¶¶ 1–85). The court **GRANTS IN PART** and **DENIES**

---

[1] The court will refer to OnTime and Defendants Amy Harmon, Paul Weatherford, Kelli Rucker, and Matthew Blue, M.D., collectively as "OnTime".

**IN PART** OnTime's twelfth counterclaim (ECF No. 49 at 14–15 ¶¶ 86–87). Specifically, as it concerns both ASIC's Motion for Summary Judgment and OnTime's counterclaims, the court finds that ASIC owes no duty of defense under the Auto Policy, but ASIC does owe a duty of defense under the CGL Policy.

## I. FACTUAL AND PROCEDURAL BACKGROUND

OnTime is, *inter alia*, an emergency and non-emergency medical transportation provider.[2] (ECF No. 63 at 1.) On January 7, 2015, OnTime transported R.S. from her home in Orangeburg, South Carolina, to the Burn Center of Trident Medical Center ("Trident") in Charleston, South Carolina, for treatment of facial burns she sustained in late December 2014. (ECF No. 1-1 at 7 ¶ 8.) Upon arrival at Trident, R.S. "had a seizure, [was] slumped over on her right side, and lost consciousness." (*Id.* at 8 ¶ 18.) Shortly thereafter, R.S. died in Trident's Emergency Department. (*Id.* at 9 ¶ 20–21.) On February 16, 2017, Smith, individually and as Personal Representative of the Estate of R.S., filed a medical malpractice action in the First Judicial Circuit Court of Common Pleas in Orangeburg County, South Carolina, against OnTime, the Emergency Medical Technicians ("EMTs")[3], and one of OnTime's administrative assistants, Kelli Rucker.[4] (ECF No. 1-1 at 5; ECF No. 63-7 at

---

[2] OneTime "specialize[s] in the following: [a]mbulance (patients that require medical attention)[,] [n]on-[a]mbulatory (patients that can not (sic) walk)[,] [a]mbulatory (patients that can walk)[,] [w]heelchair[,] [c]ertified [t]raining [c]enter[,] and "[c]ommunity [e]vents and [c]harities." OnTime Transport, *About Us*, https://www.ontimetransportllc.com/about.html (last visited July 31, 2019); OnTime Transport, *Home*, https://www.ontimetransportllc.com/index.html (last visited July 31, 2019). *See Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and it is capable of accurate and ready determination." (citing Fed. R. Evid. 201(b))).

[3] Amy Harmon and Paul Weatherford.

[4] On March 14, 2018, Defendant Rucker was dismissed without prejudice from Smith's state court action because she was "not involved in the transport of [R.S.]" (ECF No. 63-1 at 2 n.1; ECF No. 63-2 at 2.) But, "Rucker has not been dismissed from the instant federal coverage action." (ECF No. 63-1 at 2 n.1.)

2:13–14; ECF No. 76 at 16.)

On March 5, 2018, Defendant Smith filed another medical malpractice action against Matthew Blue, M.D. ("Dr. Blue") in the same forum. (ECF No. 42-1 at 4 ¶ 6.) Dr. Blue served as OnTime's "Medical Control Director" at the time. (*Id.*) Because the two actions were filed in the First Judicial Circuit Court of Common Pleas, the court consolidated them into one action ("Underlying Action") at the consent of the parties. (ECF No. 63-3 at 2.) In the Underlying Action, Smith asserts several claims: (1) "[n]egligence/[g]ross [n]egligence – [s]urvival"; (2) "wrongful death"; and (3) "general negligence." (ECF No. 1-1 at 10–16 ¶¶ 28–46.)

On December 8, 2016, and, again, on February 22, 2018, ASIC sent Reservation of Rights letters ("ROR")[5] to OnTime. (ECF No. 63-4 at 1; ECF No. 63- 5 at 1.) In these RORs, ASIC informed OnTime that ASIC "w[ould] be providing a defense to the claims [in the Underlying Action] under a full and complete [ROR]." (ECF No. 63-4 at 2; ECF No. 63-5 at 2.) ASIC further informed OnTime that:

> The [CGL Policy] contains exclusions for claims of breach of medical professional services, health care professional services and punitive damages. The claims against you by Smith are grounded in medical and health care professional services. The endorsements containing the exclusions bar application of the duty of defense and duty of indemnity to the [Underlying Action].

> The [Auto Policy] requires an accident. The [Underlying Action] does not include an accident. As such, the [Underlying Action] does not trigger the duty of defense or the duty of indemnity under the [Auto Policy].

> Despite the policy language analyzed thus far indicating that no duty of defense or indemnity exists, we are providing a defense to you under a full and complete Reservation of Rights.

(ECF No. 63-4 at 7; ECF No. 63-5 at 7.)

On April 28, 2017, ASIC filed a declaratory judgment action in this court "seeking

---

[5] ASIC sent OnTime the second ROR letter on February 22, 2018, after Smith gave notice of his intention to file a second medical malpractice action against Dr. Blue, to "revise the previously-provided [ROR] letter dated December 8, 2016." (ECF No. 63-5 at 2.)

declaration as to the rights and obligations of the parties pursuant to policies of insurance sold by ASIC to OnTime." (ECF No. 1 at 1 ¶ 1.) On March 24, 2018, after Smith filed suit in state court against Dr. Blue, ASIC filed an Amended Complaint in this court, adding Dr. Blue as a Defendant. (ECF No. 42.) On April 18, 2018, Defendant Smith filed an Answer to ASIC's Amended Complaint. (ECF No. 48.) On May 9, 2018, OnTime filed an Answer and Counterclaim to ASIC's Amended Complaint. (ECF No. 49.)

On December 17, 2018, ASIC filed the instant Motion for Summary Judgment. (ECF No. 63.) Regarding the Auto Policy, ASIC first contends that Smith's allegations in the Underlying Action do not trigger coverage because "OnTime was not involved in any automobile accident during its transport of [R.S.] to Trident, and Smith does not allege that OnTime was involved in any accident…" (ECF No. 63-1 at 7.) ASIC further contends that even if OnTime could show that an accident occurred, it cannot show that the accident arose out of the "ownership, maintenance or use" of its ambulance, as required by the Auto Policy. (*Id*. at 8 (quoting ECF No. 1-3 at 23, Section II(A)).)

Regarding the CGL Policy, ASIC argues that coverage has not been triggered because "OnTime did not cause [R.S.]'s death." (*Id.* at 9.) Therefore, since the CGL Policy "only provides coverage for damages which the insured becomes 'legally obligated to pay,'" ASIC contends that it "cannot become legally obligated to pay for her damages." (*Id.*). But, "[t]o the extent that coverage has been triggered under the CGL Policy," ASIC argues the CGL Policy's "Designated Professional Services" Exclusion and the "Services Furnished by Health Care Providers" Exclusion (collectively, "Exclusions") preclude coverage, because in the Underlying Action, Smith alleges that OnTime was engaged in a professional service, and specifically, was providing a "medical service" to R.S. when OnTime transported her to Trident. (*Id.* at 9–11.) More specifically, ASIC argues that, while transporting R.S. to Trident, OnTime's workers were functioning as EMTs, which ASIC argues is a professional service under South Carolina law. (*Id.*

4

at 11–17 (relying on *W. Word Ins. Co. v. Empire Fire & Marine Ins. Co.*, No.7:06-cv-217, 2006 WL 3337427 (D.S.C. Nov. 16, 2006)).)

As to Dr. Blue, ASIC argues that Smith's allegations that Dr. Blue "failed to properly train OnTime employees, including Weatherford and Harmon in medical assessment and treatment," are "specifically contemplate[d]" by the Designated Professional Services Exclusion. (*Id.* at 17.)

Lastly, as to OnTime's counterclaims, ASIC maintains that "the Policies do not provide coverage for the claims asserted against OnTime, [therefore,] OnTime's counterclaims necessarily fail since they are premised on the notion that the Policies provide coverage." (*Id.* at 18.) ASIC also asserts that contrary to OnTime's counterclaim regarding the ROR, ASIC "cannot, and did not, waive any of its rights to contest coverage by providing a defense to OnTime that South Carolina law requires." (*Id.* at 20.)

On January 11, 2019, OnTime filed a Response to ASIC's Motion. (ECF No. 76.) OnTime stresses that ambiguous terms and exclusions in an insurance contract are to be strictly construed against the insurer. (*Id.* at 6–7.) In that vein, OnTime maintains that several terms in the Policies are ambiguous, including the term "accident" as used in the Auto Policy. (*Id.* at 7.) OnTime argues that ASIC's definition of "accident" is "specific and narrowly scoped" and that the court should apply the broader, plain meaning of the word, which OnTime argues would establish coverage. (*Id.* at 8–10.) OnTime further argues that based on the testimony and evidence, there are genuine issues of material fact as to whether an accident occurred during the transport of R.S. Specifically,

> whether an accident occurred when the [OnTime] ambulance went to North Charleston, rather than [Trident]. It can reasonably be inferred that because the trip took longer to travel to North Charleston, the patient went longer without what the Smith allegations say was the appropriate treatment, and if proven, this "continuous exposure" can be shown to have weakened her condition and resulted in her death.

(*Id.* at 11.)

As to the CGL Policy, OnTime first addresses ASIC's argument that coverage has not been triggered under the Policy because OnTime did not cause R.S.'s death and, therefore, cannot become legally obligated to pay for her damages. (*See* ECF No. 63-1 at 9.) OnTime argues that "the language of the policy provid[ing] that [ASIC] will pay damages the insured is 'legally obligated to pay'… creates a reasonable inference that the [U]nderlying [A]ction must first be adjudicated to determine the issues relating to coverage." (ECF No. 76 at 14.) Therefore, OnTime asserts that ASIC's "outlandish claim"—essentially, that because [an insured] [denies liability] in a case and pursue[s] defenses, the [insured] somehow waives their right to coverage—is "unsupported, and evidences a dangerous level of bad faith." (*Id.*)

As to the CGL Policy's Designated Professional Service Exclusion, OnTime claims there is a genuine issue of material fact "as to whether the services provided and/or not provided by [OnTime] fall under the definition of 'medical service.'" (*Id.* at 15.) More specifically, as to Dr. Blue, OnTime argues:

> there has been no evidence that . . . Dr. Blue ever met with, treated, examined or was contacted about [R.S.], her transport or condition, and therefore, no Doctor-Patient relationship was formed on which [ASIC] can claim that either the [Professional Services] [E]xclusion or the . . . [H]ealth [C]are [P]roviders Exclusion apply.

(*Id.*)

As to Weatherford and Harmon, OnTime argues that:

> [w]hile the EMTs assigned to [transport R.S.] were professional, they are not considered medical professionals. Defendants Harmon and Weatherford were Basic EMTs, because they did not possess the requisite certification for intermediate EMT or paramedic. . . . Paramedics were hired by . . . OnTime to be able to provide Advance Life Support . . . versus just Basic Life Support . . ., as was the case here, where two basic EMTs staffed the vehicle, with one driving and one attending the patient. It can, therefore reasonably be inferred and argued that at times, Basic EMTs may provide medical services under the terms of the [P]olicy, and at times, do not. [T]here are genuine issues of material fact as to whether what the Basic EMTs did in this case can even be considered "medical service" *which is undefined in the* [P]olicy.

(*Id.* at 16–18 (citations omitted ).)

Finally, relying on the South Carolina Supreme Court's recent decision in *Harleysville Group Ins. v. Heritage Communities., Inc.*, 803 S.E.2d 288 (S.C. 2017), OnTime argues "the [ROR] letters are ambiguous because they refer to the same ambiguous terms in the [P]olic[ies] [that are] susceptible to more than one interpretation, and under *Harleysville*, the letters must be strictly construed." (*Id.* at 29.) OnTime further argues that the ROR letters are insufficient under *Harleysville* because they "never advised . . . [Defendants] in the [ROR] letters of the need for an allocated verdict as to covered vs. non-covered claims, which was a fatal flaw in *Harleysville.*" (*Id.* at 30.) OnTime also challenges whether the ROR letters were properly served:

> although . . . OnTime was sent the [ROR] letters, and although [ASIC] had knowledge *of all defendants* named in [the Underlying Action], . . . [ASIC] has never sent [ROR] *notices to any Defendants other than* . . . *OnTime*, which no longer employs some of the named Defendants, clearly creating numerous issues of material fact as to whether all Defendants were given proper notice of [ASIC]'s position on coverage in the letters.

(*Id.*)

On January 17, 2019, ASIC submitted a Reply to OnTime's Response. (ECF No. 77.) And on May 13, 2019, the court held a hearing on ASIC's Motion. (ECF No. 83.)

## II.    JURISDICTION

The court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) based on ASIC's allegations that the action is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00. (*See* ECF No. 42 at 1–2 ¶¶ 2–9.) Specifically, ASIC alleges that it is an Illinois insurance company, with its principal place of business in Illinois, and has authorization to sell insurance policies in South Carolina. (*Id.* at 1 ¶ 2.) OnTime is a South Carolina limited liability company. (*Id.* at 2 ¶ 3; ECF No. 49 at 2 ¶ 3.) ASIC brings this diversity action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil

Procedure 57. (ECF No. 1 at 1.)

### III.    LEGAL STANDARD

Summary judgment is a drastic remedy and "should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case." *Ballinger v. N. C. Agr. Extension Serv.*, 815 F.2d 1001, 1004–05 (4th Cir. 1987). *See also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists when, after reviewing the record as a whole, the court finds a reasonable jury could return a verdict for the non-moving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

When ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). The non-moving party may not oppose a summary judgment motion with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(e). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). All that is required to survive summary judgment is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Under the Declaratory Judgment Act, a district court, in a case or controversy otherwise within its jurisdiction, 'may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Columbia Ins. Co. v. Reynolds*, 225 F. Supp. 3d 375,

379 (D.S.C. 2016) (quoting 28 U.S.C. § 2201(a)). "[A] declaratory judgment action is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)). But, "[w]hen a related state court proceeding is pending, however, 'considerations of federalism, efficiency, and comity' should inform the district court's decision whether to exercise jurisdiction over a declaratory judgment action." *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004) (quoting *Centennial Life Ins. Co.*, 88 F.3d at 257).

## IV.    ANALYSIS

At the outset, the parties agree, and the law establishes, that South Carolina law applies to the interpretation of the Policies at issue. *See Stahle v. CTS Corp.*, 817 F.3d 96, 99–100 (4th Cir. 2016) ("Because federal jurisdiction in this matter rests in diversity, our role is to apply the governing state law." (footnote omitted)); *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 599–600 (4th Cir. 2004) ("A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits."); *Nat'l Quarry Servs., Inc. v. First Mercury Ins. Co., Inc.*, 372 F. Supp. 3d 296, 301 (M.D.N.C. 2019) ("A federal court sitting in diversity or supplemental jurisdiction generally applies the relevant substantive law of the state in which the court sits, while applying federal procedural law." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 72–73, 79–80 (1938))). (*See also* ECF No. 63-1 at 6–7; ECF No. 76 at 6–7.)

South Carolina follows the rule of *lex loci contractus*, which provides that the law of the state where the contract was made governs the interpretation of the contracts. *See Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182, 184 (S.C. Ct. App. 1993) ("Unless the parties agree to a different rule, the validity and interpretation of a contract is ordinarily to be determined by the law

of the state in which the contract was made." (citation omitted)).[6] Accordingly, as the Policies were issued in South Carolina, South Carolina law applies. (*See* ECF No. 1-3; ECF No. 1-4.)

"It is well settled in South Carolina that provisions of an insurance policy are to be liberally construed in favor of the insured." *State Farm Fire & Cas. Co. v. Barrett*, 530 S.E.2d 132, 135 (S.C. Ct. App. 2000). *See also Jefferson-Pilot Fire & Cas. Co. v. Sunbelt Beer Distribs., Inc.*, 839 F. Supp. 376, 378 (D.S.C. 1993) ("South Carolina law commands that insurance coverage is to be liberally construed against the insurer, and any ambiguities in the policy are to be interpreted in favor of the insured."). "When a policy does not specifically define a term, the term should be defined according to the usual understanding of the term's significance to the ordinary person." *Barrett, 530 S.E.2d* at 136. "Questions of coverage and the duty of a liability insurance company to defend a claim brought against its insured are determined by the allegations of the third party's complaint." *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 319 (S.C. Ct. App. 1994). *See also Jefferson-Pilot Fire & Cas. Co.*, 839 F. Supp. at 378 ("It is well settled under South Carolina law that '[a]n insurer's duty to defend is determined from the allegations of the complaint…to determine coverage, a court in a declaratory judgment action should compare the complaint in the underlying action with the language of the policy to see whether the complaint alleges any facts that could possibly bring the action within the coverage of the policy." (quoting *Shelby Mut. Ins. Co. v. Askins*, 413 S.E.2d 855, 859 (S.C. Ct. App. 1992))).

---

[6] The court acknowledges:

> the traditional rule of *lex loci contractus* is modified by S.C. Code Ann. § 38–61–10, . . . . [which] provides: "All contracts of insurance on property, lives, or interests in this State are considered to be made in the state and all contracts of insurance the applications for which are taken within the State are considered to have been made within this State and are subject to the laws of this State."

*Heslin-Kim v. CIGNA Grp. Ins.*, 377 F. Supp. 2d 527, 530 (D.S.C. 2005) (quoting S.C. Code Ann. § 38–61–10).

A.  Auto Policy

The court first decides whether allegations in the Underlying Action bring Smith's claims within coverage under the Auto Policy. In the Underlying Action, as relevant to the Auto Policy, Smith makes the following allegations:

(1) after arriving at R.S.'s home in Orangeburg to transport her to Trident in Charleston, "OnTime . . . diagnosed [R.S.] with severe muscle weakness and as being in a deconditioned state. OnTime . . . observed [B.S] was unable to bear weight or sit upright. OnTime . . . also made note of [R.S.]'s complaints of having chest pains and poor circulation in her hands" (ECF No. 1-1 at 7 ¶ 8.);

(2) "OnTime . . . was also aware that [R.S.] was in dialysis treatment but had missed two dialysis appointments (about one week of dialysis) and was currently in renal failure, with extremely elevated potassium levels" (*id.* at 7 ¶ 10.);

(3) "rather than transporting [R.S.] to the closest appropriate facility, the Regional Medical Center in Orangeburg, South Carolina – approximately 3.2 miles from [R.S.]'s home – based on the symptoms [R.S.] was presenting and her deconditioned state, OnTime . . . transported [R.S.] to Trident . . . in North Charleston, South Carolina – which is approximately 62 miles from [R.S.]'s home" (*id.* at 7–8 ¶ 12.);

(4) "OnTime . . . consciously failed to ascertain, recognize, and document the patient's co-morbidities that predisposed her to an acute coronary event" (*id.* at 8 ¶ 13.);

(5) "OnTime . . . consciously failed to assess the Cardiac Rhythm and 12 Lead ECG of a patient with Chest Pain and the risk for Hyperkalemia" (*id.* at 8 ¶ 14.);

(6) "OnTime . . . consciously failed to assess the SpO2 and EtCO2 of the potentially Hyperkalemic patient" (*id.* at 8 ¶ 15.);

(7) "OnTime . . . consciously failed to assess the BGL for Hyperkalemia in a Diabetic

11

patient who had missed two previous Dialysis treatments" (*id.* at 8 ¶ 16.);

(8) "Upon arrival at Trident . . ., [R.S.] had a seizure and [was] slumped over on her right side, and lost consciousness" (*id.* at 8 ¶ 18.);

(9) OnTime attempted to revive R.S. using a crash cart and defibrillator (*id.* at 8 ¶ 19.);

(10) while compressions were being administered, R.S. was moved from the burn center to Trident's Emergency Department, at which point, Trident Emergency Department personnel "took over from OnTime" and R.S. was pronounced dead about one (1) hour and a half later (*id.* at 9 ¶ 19.);

(11) "[R.S.]'s family was told that, because [R.S.] missed two dialysis appointments that week, her potassium level was extremely high which led to cardiac arrest" (*id.* at 9 ¶ 22.); and

(12) "[h]ad [R.S.] been properly evaluated and treated in a timely manner . . . it is more likely than not that [R.S.] would have survived the episode of an acute coronary event." (*id.* at 9 ¶ 23.)

The Auto Policy provides that ASIC "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (ECF No. 1-3 at 23.) The Auto Policy defines "accident" as "includes continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.'" (*Id.* at 31.)

Several courts, in the context of insurance contracts, have found the "includes continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage'" language to "not [be] a specific definition of 'accident.'" *Nat'l Liab. & Fire Ins. Co. v. Matt's Auto World Preowned Cars, LLC*, No. 3:14-CV-38 GROH, 2015 WL 1528897, at *6 (N.D.W. Va. Apr. 2, 2015). *See also Laboss Transp. Servs., Inc. v. Glob. Liberty Ins. Co. of N.Y.*, 208 F. Supp. 3d 1268, 1275 (S.D. Fla. 2016) ("The [p]olicy broadly defines 'accident' to 'include continuous or

repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage'…but the [p]olicy does not affirmatively state what constitutes an accident."); *Travelers Prop. Cas. Co. of Am. v. Moore*, No. 1:11-CV-0236-AT, 2013 WL 12099155, at *11 (N.D. Ga. Aug. 26, 2013) (similar definition of 'accident' under policy allowed for multiple interpretations and was ambiguous); *N.H. Ins. Co. v. Hill*, No. CIV.A. 11-414-CG-B, 2012 WL 3685500, at *5 (S.D. Ala. Aug. 23, 2012) ("The meaning of the [p]olicy's definition— "accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage'"—is far from self-evident, and briefing would have been useful." (citation omitted)).

Although the court is inclined to agree, "[i]t is axiomatic that in determining state law, a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). And, the South Carolina Supreme Court, in the context of insurance contracts, has explicitly addressed the meaning of the term "accident" in insurance contracts:

> Judicial decisions defining such terms as 'accident', 'accidental bodily injury', etc. are indeed quite numerous but, as held by this court in *Goethe v. N.Y. Life Ins. Co.*, . . . 190 S.E. 451 (S.C. 1937), such terms appearing in insurance policies should be defined according to the ordinary and usual understanding of their significance to the ordinary or common man. A quite simple, but by no means all inclusive, definition of the word 'accident' as understood by the ordinary man is,
>
> > 'An unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt.'

*Green v. United Ins. Co. of Am.*, 174 S.E.2d 400, 402 (S.C. 1970). *See also Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 543 (S.C. 2009) ("In the absence of a prescribed definition, 'accident' [means] '[a]n unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt.'" (alteration in original) (quoting *Green*, 174 S.E.2d at 402)); *State Farm Mut. Auto. Ins. Co. v. Moorer*, 496

S.E.2d 875, 882 (S.C. Ct. App. 1998). The facts alleged in the Underlying Action may meet this definition of "accident," but coverage under the Auto Policy requires more than just an accident; it requires "an 'accident' . . . *resulting from the ownership, maintenance or use* of a covered 'auto.'" (ECF No. 1-3 at 23 (emphasis added).)

The South Carolina Supreme Court has also established an "ownership, maintenance or use" test:

> We enunciated a three-part test in *State Farm Fire & Cas. Co. v. Aytes*, to determine whether an injury arises out of the "ownership, maintenance, or use" of a motor vehicle. The party seeking coverage must show:
>
> *(1) a causal connection exists between the vehicle and the injury*
> *(2) no act of independent significance breaks the causal link between the vehicle and the injury; and,*
> *(3) the vehicle was being used for transportation purposes at the time of the injury.*

503 S.E.2d 744, 745 (1988).

In analyzing whether an injury arose out of the "ownership, maintenance, or use" of a vehicle, "no distinction is made as to whether the injury resulted from a negligent, reckless, or intentional act." *Peagler v. USAA Ins. Co.*, 628 S.E.2d 475, 479 (S.C. 2006). The three-part test in *Aytes* "applies regardless of whether the injury occurred as a result of an intentional assault or an accident. *The focus is on the extent of the role, if any, the vehicle played in causing the injuries or damage*, or whether a particular activity is a covered use as required by statute or a policy provision." *Id.* at 478–79 (emphasis added) (quoting *Home Ins. Co. v. Towe*, 441 S.E.2d 825, 827 (S.C. 1994)).

Smith's allegations in the Underlying Action may satisfy parts two and three of the *Aytes* test, but the allegations do not satisfy part one because a causal connection does not exist between the vehicle and the injury. *See id.* at 479 ("A causal connection between the vehicle and the injury must exist in order for an injury to be covered by an automobile insurance policy."). In *Peagler*, the South Carolina Supreme Court repeated its previous holding that "[a] causal connection means: (a)

the vehicle was an 'active accessory' to the injury; (b) the vehicle was something less than the proximate cause but more than the mere site of the injury; and (c) the injury was foreseeably identifiable with the normal use of the vehicle." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Bookert*, 523 S.E.2d 181, 182 (1999)).

Here, Smith's allegations are based on OnTime's EMTs' medical treatment *decisions* made immediately before and during their transport of B.S, not OnTime's ownership, maintenance, or use of its ambulance. For example, Smith alleges that given OnTime's knowledge and observation of R.S.'s condition upon arrival at her home, OnTime EMTs should have taken R.S. to a local hospital instead of Trident. (*See* ECF No. 1-1 at 7–8 ¶¶ 8, 10, 12.) Thus, Smith challenges OnTime's *decision* to transport R.S. to Trident, not OnTime's use of its ambulance to transport R.S. to Trident. (*See*, *id.* at 11 ¶ 29 (alleging OnTime failed to "involve an OnTime Transport Supervisor in the *appropriate Transport destination decision for* a patient with Chest Pain" (emphasis added)).) More specifically, Smith alleges OnTime's EMTs failed to properly "ascertain," "recognize," "document," "assess," and "evaluate," R.S.'s condition and symptoms. (*Id.* at 8–9 ¶¶ 13–16, 23.) Again, Smith's allegations center on the EMTs' medical treatment decisions and the propriety of those decisions by OnTime's EMTs. Thus, instead of incriminating OnTime's ambulance as an "active accessory" to R.S.'s death, Smith's allegations do exactly what the South Carolina Supreme Court has held is insufficient for coverage—implicate OnTime's ambulance as the "mere site" of R.S.'s injury. *Peagler*, 628 S.E.2d at 479 ("[A] causal connection means… *more than the mere site of the injury*") (emphasis added) (quoting *Bookert*, 523 S.E.2d at 182)).

Based on Smith's allegations, while in OnTime's ambulance, OnTime failed to properly ascertain, recognize, document, assess, evaluate, and treat R.S. and her symptoms and conditions. But, nothing in Smith's allegations indicate OnTime's ambulance played any role in R.S.'s death

beyond being the site of R.S.'s injury. In fact, OnTime's ambulance is never mentioned in the Underlying Action, and is only implicated by Smith's use of the word "transport." (*See* ECF No. 1-1.) *See also Integon Gen. Ins. Co. v. Bartkowiak ex rel. Bartkowiak*, No. 7:09- CV-03045-JMC, 2010 WL 4156471, at *5 (D.S.C. Oct. 19, 2010) ("[T]here is no causal connection when the injured person was merely an occupant of the vehicle." (citing *Aytes*, 503 S.E.2d 744, 746)); *Peagler*, 628 S.E.2d at 479 ("The focus is on the extent of the role, if any, the vehicle played in causing the injuries or damage.").

Furthermore, R.S.'s death was not "foreseeably identifiable with the *normal use of the vehicle*." *Aytes*, 503 S.E.2d at 745–46 (emphasis added). In *Wright v. North Area Taxi, Inc.*, the South Carolina Court of Appeals, relying on a decision from the Michigan Supreme Court, addressed the meaning of "foreseeably identifiable":

> In *Thornton v. Allstate Ins. Co.*, . . . 391 N.W.2d 320 ([Mich.] 1986), the Michigan Supreme Court addressed an almost identical issue, finding the use of a motor vehicle as a motor vehicle did not cause the injury to the taxi driver. Thornton was a taxi driver who received a call directing him to pick up a fare. Upon his arrival, the passengers entered the car and gave Thornton a specific destination. As he drove away from the curb, one passenger shot and robbed him. Thornton sued under the taxi company's first-party personal injury protection (PIP) benefits asserting that his injuries arose out of his ownership, operation, maintenance, or use of the vehicle. He argued the taxi was an instrumentality of the injury. The Michigan Supreme Court rejected this argument.
>
> > The connection in this case between the debilitating injuries suffered by Thornton and the use of the taxicab as a motor vehicle is no more than incidental, fortuitous, or 'but for.' The motor vehicle was not the instrumentality of the injuries. The motor vehicle here was merely the situs of the armed robbery—the injury could have occurred whether or not Thornton used a motor vehicle as a motor vehicle. The relation between the functional character of the motor vehicle and Thornton's injuries was not direct—indeed, the relation is at most incidental.
>
> 391 N.W.2d at 327–28 (citations omitted).
>
> The *Thornton* court conceded the injuries were likely "foreseeably identifiable" with the occupational or commercial use of a motor vehicle as a taxi, but the relation of the injury to the functional use of a motor vehicle as a motor vehicle was merely

incidental and fortuitous. "The mere foreseeability of an injury as an incident to a given use of a motor vehicle is not enough to provide . . . coverage where the injury itself does not result from the use of the motor vehicle as a motor vehicle." *Id.* at 328; *see also Nationwide Mut. Ins. Co. v. Brown,* 779 F.2d 984, 989 (4th Cir. 1985) ("An assault by an armed assailant upon the driver of a car is not the type of conduct that is foreseeably identifiable with the normal use of a motor vehicle.").

523 S.E.2d 472, 475 (S.C. Ct. App. 1999) (footnote omitted). Here, Smith's allegations indicate that "the relation of [R.S.'s death] to the functional use of [OnTime's ambulance] as a motor vehicle was merely incidental and fortuitous," especially because Smith alleges R.S.'s death resulted from the *medical treatment decisions* of OnTime's EMTs, not "from the use of [OnTime's ambulance] *as a motor vehicle*." *Id.* (quoting *Thornton*, 391 N.W.2d at 328) (emphasis added). (*See* ECF No. 1-1.) Accordingly, the court finds Smith's allegations do not bring the Underlying Action within the Auto Policy's coverage because Smith does not allege R.S.'s death was "caused by an 'accident' . . . resulting from the ownership, maintenance or use of a covered 'auto.'" (ECF No. 1-3 at 23.)[7]

B. CGL Policy

The court next turns to whether allegations in the Underlying Action bring Smith's claims within coverage by the CGL Policy. The CGL Policy provides that:

> [ASIC] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. . . .
>
> This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> (2) The "bodily injury or "property damage" occurs during the policy period; and
> (3) Prior to the policy period, no insured . . . knew that the "bodily injury" or

---

[7] Based on this finding, the court denied OnTime's request for dismissal under Federal Rule of Civil Procedure (12)(b)(6). (*See* ECF No. 49 at 7-8 ¶¶ 45-46.)

> "property damage had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred than any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

(ECF No. 1-2 at 13.) The CGL Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (*Id.* at 25.) "Occurrence" is defined in the CGL Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 27.) The CGL Policy also includes exclusions for "Designated Professional Services" ("Professional Services Exclusion") (*id.* at 44) and "Services Furnished by Health Care Providers" ("Health Care Providers Exclusion") (*id.* at 45). The Professional Services Exclusion provides that:

> [w]ith respect to any [medical service],[8] the following [E]xclusion [applies]:
>
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any [medical] service.
>
> This [E]xclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising" injury", involved the rendering of or failure to render any [medical] service.

(*Id.* at 44.)

"Medical Service" is not defined in the CGL Policy. (*See id.*) However, the Health Care Providers Exclusion provides that:

> [w]ith respect to [passenger transportation service],[9] this insurance does not apply

---

[8] In a Schedule titled "Description of Professional Services," the Professional Services [E]xclusion lists the professional services to which the Exclusion applies. (ECF No. 1-2 at 13.) In that Schedule, only one professional service is listed: "MEDICAL SERVICE." (*see id.*)

[9] In a Schedule titled "Description of Operations," the Health Care Providers [E]xclusion lists the

to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The rendering of or failure to render:
   a. Medical, surgical, dental, X-ray or nursing service, treatment, advice or instruction, or the related furnishing of food or beverages;
   b. Any health or therapeutic service, treatment, advice or instruction; or
   c. Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;
2. The furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances; or
3. The handling or treatment of dead bodies, including autopsies, organ donation or other procedures.

This [E]xclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury" involved that which is described in Paragraph **1., 2.,** or **3.**

(*Id.* at 45.)

In their briefings and at the hearing on ASIC's Motion regarding the CGL Policy, the parties committed most of their arguments to whether the Professional Services and Health Care Providers Exclusions bar coverage, respectively. (*See* ECF No. 63-1 at 9–18; ECF No. 76 at 15–27.) But even if those Exclusions apply as to some of the allegations of the Underlying Action, the Exclusions may not apply to other allegations in the Underlying Action. *See Jefferson-Pilot Fire & Cas. Co.*, 839 F. Supp. at 378 ("A court in a declaratory judgment action should…see whether the complaint alleges any facts that could possibly bring the action within the coverage of the policy." (quoting *Shelby Mut. Ins. Co.*, 413 S.E.2d at 859)).

Generally, the Professional Services and Health Care Providers Exclusions do not apply to

operation to which the Exclusion applies. (ECF No. 1-2 at 13.) In that Schedule, only one operation is listed: "PASSENGER TRANSPORTATION SERVICE."

bodily injury that results from "the rendering of or failure to render any [*medical*] service." (ECF No. 1-2 at 44 (Professional Services Exclusion) (emphasis added).) (*See also* ECF No. 1-2 at 45 (Health Care Providers Exclusion) ("[T]his insurance does not apply to 'bodily injury' arising out of: . . . [t]he rendering of or failure to render . . . *medical* . . . service." (emphasis added)).) The Underlying Action explicitly asserts that OnTime's EMTs "w[ere] providing *medical services* to [R.S.]" (ECF No. 1-1 at 5-6 ¶¶ 2– 5.) Although "medical service" is not defined in the CGL Policy, the ordinary person would, usually, understand the term "medical service" to include Smith's allegations regarding OnTime's "failure" to "ascertain, recognize, . . . document . . . and properly assess" R.S.'s conditions, namely diabetes, and "symptoms," including "[c]hest [p]ain," and her predisposal to a "[s]udden [c]ardiac [e]vent," an "[a]cute [c]oronary event," and "[h]yperkalemia."(*See id.* at 10–11 ¶ 29.) *See also Barrett*, 530 S.E.2d at 136 ("When a policy does not specifically define a term, the term should be defined according to the usual understanding of the term's significance to the ordinary person.").

But this does not end the inquiry because elsewhere in the Underlying Action, Smith makes allegations that *do not* involve medical services and says so explicitly. *See Affinity Living Grp., LLC v. StarStone Specialty Ins. Co.*, 350 F. Supp. 3d 424, 429 (M.D.N.C. 2018) ("Billing for medical services does not fall within the policy definition of 'medical professional services,' and thus does not qualify as a covered 'medical incident.' That does not end the inquiry, as the Gugenheim complaint elsewhere does allege a 'medical incident' within the meaning of the policy."). For example, Smith alleges that

> while [R.S.] was under the care of . . . OnTime . . ., [OnTime] departed from prevailing and acceptable professional standards of routine, administrative, ministerial and/or *non-medical* care and treatment of R.S. and w[as] thereby negligent, careless, grossly negligent, reckless and in violation of the duties owed to [R.S.].

(ECF No. 1-1 at 15 ¶ 44 (emphasis added).)

The court acknowledges that "[i]n examining the complaint, a court must look beyond the labels describing the acts to the acts themselves which form the basis of the claim against the insurer." *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897, 899 (S.C. 2008). Thus, the mere label of "non-medical care" alone does not bring Smith's claims within the CGL Policy's coverage. However, Smith also alleges actions such as OnTime's "employ[ment] [of] certain employees when . . . OnTime . . . knew or should have known that doing so would result in a patient's harm," which does not implicate OnTime's EMTs' rendering or failure to render any medical service, and therefore does not fall within the Professional Services or Health Care Providers Exclusions. (ECF No. 1-1 at 15 ¶ 44; *see also* ECF No. 42-1 at 10 ¶ 29 (alleging Dr. Blue failed to "train educate and/or supervise OnTime . . . regarding the South Carolina Department of Health and Environmental Control's regulations and protocols governing the practice of EMS services in South Carolina" and how to "render proper non-medical care".). Thus, the court finds the Underlying Action includes allegations that could "possibly bring the action within coverage of the [P]olicy." *Jefferson-Pilot Fire & Cas. Co.*, 839 F. Supp. at 378.[10]

Lastly, the court considers ASIC's ROR letters, which are relevant to almost all of OnTime's counterclaims. OnTime generally argues that (1) "by providing a defense to the

---

[10] ASIC also argues that "[i]f . . . OnTime did not cause [R.S.]'s death, then coverage has not been *triggered* under the CGL Policy. The CGL Policy only provides coverage for damages which the insured becomes 'legally obligated to pay.'" (ECF No. 1-2 at 13, Section I(1)(a).) If OnTime did not cause [R.S.]'s injuries, it cannot become legally obligated to pay for her damages." ASIC's argument is unavailing as to whether the allegations in the Underlying Action bring Smith's claims within coverage of the CGL Policy. ASIC may be correct that if OnTime did not cause R.S.'s injuries, coverage under the CGL Policy is not triggered. But the court's role in this declaratory judgment action does not include determining whether OnTime caused R.S.'s death; instead, it is limited to "compar[ing] the complaint in the underlying action with the language of the policy to see whether the complaint alleges any facts that could possibly bring the action within the coverage of the policy." *Jefferson-Pilot Fire & Cas. Co.*, 839 F. Supp. at 378. And, in the Underlying Action, Smith alleges OnTime's "negligent, grossly negligent, and/or reckless actions or omissions. . . caused [R.S.] to needlessly physically suffer and ultimately die." (ECF No. 1-1 at 9 ¶ 25.)

[U]nderlying . . . [A]ction, and allowing this defense to proceed from the inception of the claim in 2016, among other actions, [ASIC] has waived any basis to now deny coverage and/or the duty to defend"; and (2) ASIC "failed to provide proper notice to [OnTime] of their intention to shirk the duties of defense and indemnity" by "lull[ing] [OnTime] into the belief that their conduct which allegedly resulted in [R.S.]'s death, a claim which has been vehemently denied, would be covered if it was not the cause of death."[11] (ECF No. 49 at 9—14 ¶¶ 51–57, 62–83.) Recently, in *Harleysville Grp. Ins. v. Heritage Communities, In*c., the South Carolina Supreme Court considered the legal sufficiency of a ROR letter. 803 S.E.2d 288 (S.C. 2017). The court held that "a[ROR] letter that merely provides the insured with a copy of the policy, coupled with a general statement that the insurer reserves all of its right is [not] sufficient." *Id.* at 296. *See also id.* at 297 ("We agree with the Special Referee that generic denials of coverage coupled with furnishing the insured with a copy of all or most of the policy provisions (through a cut-and-paste method) is not sufficient."). The court explained that "it is axiomatic that an insured must provide sufficient information to understand the reasons the insurer believes the policy may not provide coverage." *Id.* at 297. The court then determined that in order to be sufficient, "[a] [ROR] letter must give fair notice to the insured that the insurer *intends to assert defenses to coverage* or to *pursue a declaratory relief action at a later date*." *Id.* (emphasis added) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 948 F. Supp. 263, 268 (S.D.N.Y. 1996)).

ASIC's ROR letters did exactly that. As to the CGL Policy, the ROR letters provided OnTime with a detailed review of the Policy and its exclusions and explained why ASIC believed the allegations in the Underlying Action "f[e]ll squarely within" the Professional Services and

---

[11] More specifically, OnTime asserts the following affirmative defenses and counterclaims regarding the ROR letters: (1) waiver, (2) equitable estoppel, (3) promissory estoppel, (4) breach of contract, (5) negligent misrepresentation, and (6) abuse of process. (ECF No. 49 at 9–14 ¶¶ 51–83.)

Health Care Providers Exclusions and, therefore, "no insurance under the [CGL] [P]olicy applies to a damage award in the [Underlying Action]." (ECF No. 63-4 at 4–6; ECF No. 63-5 at 4–6.)

As to the Auto Policy, the ROR letters also provided OnTime with a detailed review of the Policy and explained that "no accident [wa]s alleged in the [Underlying Action] and, therefore, no duty or defense of indemnity exists under this policy." (ECF No. 63-4 at 6; ECF No. 63-5 at 6–7.) At the end of the ROR letters, ASIC stated the Underlying Action did not "trigger the duty of defense or the duty of indemnity" under either the Auto Policy or the CGL Policy, but that ASIC would provide OnTime a defense "under a full and complete ROR." (ECF No. 63-4 at 7; ECF No. 63-5 at 5–7.) Thus, ASIC's ROR letters did considerably more than generally deny coverage and furnish OnTime with a copy of the Policies. *See Harleysville*, 803 S.E.2d at 296-99. *See also id.* at 297 ("We agree with the Special Referee that generic denials of coverage coupled with furnishing the insured with a copy of all or most of the policy provisions (through a cut-and-paste method) is not sufficient.").

Accordingly, the court finds the ASIC's ROR letters provided OnTime with "sufficient information to understand the reasons [ASIC] believes the [P]olic[ies] may not provide coverage." *Id.* at 297. [12] *See Owners Ins. Co. v. Cruz Accessories*, No. 2:17-CV-2215-RMG, 2018 WL

---

[12] OnTime also argued that "by filing suit to avoid its duties of defense and indemnity before it has been established that the alleged conduct of [OnTime] was the proximate cause of [R.S.]'s death, [ASIC] has breached the covenant of good faith and fair dealing." (ECF No. 49 at 10–11 ¶¶ 58–63.) Such an argument hardly requires comment, as declaratory judgment actions are specifically authorized by federal law and are frequently used to resolve disputes over liability insurance coverage, even in advance of judgment in, for example, a state court action. *See* 28 U.S.C.A. 2201 (West 2019) ("In a case of actual controversy within its jurisdiction, . . . as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."); *Scottsdale Ins. Co. v. GS Thadius LLC*, 328 F. Supp. 3d 527, 531 (D.S.C. 2018) ("Federal courts frequently use federal declaratory judgment actions to resolve 'disputes over liability insurance coverage, even in advance of judgment against the insured on the underlying claim for which coverage is sought.'" (quoting *Auto-Owners Ins. Co. v. Madison at Park W. Prop. Owners Ass'n, Inc.*, 834 F. Supp. 2d 437, 442–

4654704, at *4 (D.S.C. Sept. 27, 2018) ("However, *Harleysville* is inapplicable here as the grounds for the [ROR] clearly were asserted in the letter."). Based on the sufficiency of the ROR letters, the court denies OnTime's third, fourth, fifth, seventh, eighth, ninth, and tenth affirmative defenses and counterclaims. (*See* ECF No. 49 at 10–11 ¶¶ 47–57, 64–83.)

## V.    CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** American Service Insurance Company's Motion for Summary Judgement (ECF No. 63). Specifically, the court finds American Service Insurance Company owes no duty of defense under the Auto Policy, but does owe a duty of defense under the CGL Policy. The court also **DISMISSES** OnTime's first through eleventh counterclaims (ECF No. 49 at 1–14 ¶¶ 1–85). The court **GRANTS IN PART** and **DENIES IN PART** OnTime's twelfth counterclaim (ECF No. 49 at 14– 15 ¶¶ 86–87). Specifically, the court concludes that American Service Insurance Company owes no duty of defense under the Auto Policy, but does owe a duty of defense under the CGL Policy.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

August 22, 2018
Columbia, South Carolina

---

43 (D.S.C. 2011))).